UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS (Boston)

No. 1:20-cr-10098-WGY-2

UNITED STATES OF AMERICA

vs.

STEPHANIE POPP

*********

For Hearing Before:
Judge William G. Young

Sentencing

United States District Court
District of Massachusetts (Boston.)
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, October 11, 2022

********

REPORTER: RICHARD H. ROMANOW, RPR
Official Court Reporter
United States District Court
One Courthouse Way, Room 5510, Boston, MA 02210
bulldog@richromanow.com

A P P E A R A N C E S

SETH B. KOSTO, ESQ.
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3230
E-mail: Seth.kosto@usdoj.gov
For the United States of America

ADAM J. BOOKBINDER, ESQ.
RACHNA VYAS, ESQ.
Choate Hall & Stewart
2 International Place
100-150 Oliver Street
Boston, Massachusetts 02110
(617) 248-4868
Email: Abookbinder@choate.com
for the defendant

P R O C E E D I N G S

(Begins, 3:00 p.m.)

THE CLERK: Now hearing Criminal Matter 20-10098, the United States versus Stephanie Popp.

THE COURT: Would counsel please introduce themselves.

MR. KOSTO: Good afternoon, your Honor, Seth Kosto, Assistant United States Attorney for the government.

THE COURT: Good afternoon, Mr. Kosto.

MR. BOOKBINDER: Good afternoon, your Honor, Adam Bookbinder, and with me is Rachna Vyas, for Stephanie Popp who is here as well.

THE COURT: And good afternoon to you both.

May I talk to Ms. Popp directly about reading the presentence report?

MR. BOOKBINDER: Of course, your Honor.

THE COURT: Ms. Popp, have you read the presentence report that's been prepared in this case?

THE DEFENDANT: I have, your Honor.

THE COURT: Have you talked it over with your attorneys?

THE DEFENDANT: I have, your Honor.

THE COURT: Do you think you understand it?

THE DEFENDANT: I understand it, your Honor.

THE COURT: Please be seated.

Nothing's been withheld from the presentence report under the rules of criminal procedure?

PROBATION OFFICER: No, your Honor.

THE COURT: Very well.

This is a sentencing that proceeds under 18 United States Code Section 3553(a).

Do I understand that the victims wish to speak in this proceeding as well?

MR. KOSTO: They do, your Honor.

THE COURT: And they may.

So therefore sentencing will proceed really in five steps, the first three steps are largely arithmetic. First, the Court calculates the highest sentence which, as the Court understands its responsibilities constitutionally under the sentencing guidelines, the Court could impose. Second, the Court sets out or looks at the publicly-available databases to see what sentences are actually imposed for this offense. Third, the Court accurately, as the law requires, calculates the sentencing guidelines. If anyone would differ with any of the calculations the Court makes, please interrupt me at that moment, we'll try to resolve it.

After those three steps have taken place, the

Court will hear from the victims, and following that the Court will turn to hear the government, the defense, and hear from Ms. Popp if she wishes to be heard from. You will understand that I have read all the materials that have been submitted and I am prepared to proceed.

The government has made a motion, that motion is allowed. That does not indicate the sentence, but you should know that the government's motion has been allowed. Very well.

So as this Court calculates its constitutional duty, it could not sentence higher than the top of the guidelines without any mitigating factors. In this case the top of the guidelines is, um, before the discount for pleading guilty, is 27 on a criminal history, um, Category 1, and the, um, top of the guidelines is 87 months. Now the Court could not reach that without making the sentences on Counts 1 and 2 consecutive. But in any event, no sentence higher than 87 months could constitutionally be imposed.

The United States Sentencing Guidelines have a very good computer tool that really informs this Court as to the sentences nationwide for -- excuse me, who have been convicted of this crime. Interestingly here, even nationwide -- and this Court had never sentenced for this crime until this morning, so we won't, um --

and that's a matter of record, but the five offenders guilty of this crime, according to the national database, the average length of imprisonment was 55 months. I don't sentence from any average, but I always look at the average to inform me of the weight to be given to the now advisory sentencing guidelines.

Third, turning now to calculating the sentencing guidelines. On Counts 1 and 2 the base offense level is 18. I add two levels because of the pattern. I add another three levels, um, because the defendant was a manager or supervisor, but not an organizer or leader. I add another two levels for obstruction of justice. That takes us up to 25.

With respect to -- well that's as to victim 1. With respect as to victim 2, I start again at 18, add the two levels for the pattern, three levels for being a manager/supervisor, and another 2 for obstruction of justice, leading us to an adjusted offense level of 25. Putting those two together under the grouping rules gives us an adjusted offense level of 27. The Court does reduce this 27 by the three-level discount for pleading guilty, taking us to 24. That results in an advisory guideline provision of not less than 51 nor more than 63 months. The Court has in mind that the statutory maximum on each of counts 1 and 2 is 60

months. So again to get to 63, there'd have to be a consecutive sentence.

Third, the period of supervised release is 1 to 3 years. In the alternative there could be probation between 1 and 5 years. There should be a fine of not less than 20,000 nor more than $200,000, and a special assessment of, um -- $200,000, and a special assessment of $200.

Mr. Kosto, are the guidelines accurately calculated?

MR. KOSTO: They are. Your Honor made passing reference there to a special assessment of $200,000. I think you may have meant --

THE COURT: I may have misspoke, that's the top of the guideline-approved fine.

MR. KOSTO: Agreed, your Honor.

THE COURT: All right. And with the amendment as I just excepted, are those accurately calculated?

MR. BOOKBINDER: They are, your Honor.

THE COURT: Very well.

Then the Steiners may be heard at this time if they wish to be heard in this sentencing.

MR. KOSTO: Thank you, your Honor.

MRS. STEINER: Thank you, your Honor. My name is Ina Steiner, I'm Victim Number 1.

David and I have been married for 34 years. For the last 23 years we worked side by side to build a small publishing company from the ground up. Three years ago eBay sent their security team to stalk and intimidate us and burn our business to the ground. In her role as security analyst and senior manager, Defendant Stephanie Popp willingly used her experience and her skills to carry out her superiors' wishes. That experience included a degree in psychology from UCLA where she studied post-traumatic stress disorder as a research assistant. In 2019 she was in her early 30s and had worked in the security industry for 6 years.

In 2019 she participated in planning meetings held in eBay conference rooms where it was decided they would dox me. She created the social media accounts used to harass and intimidated us. She directed ads to be placed on Craig's List advertising sex parties in our home. And then she traveled to Natick to terrorize us in person. She e-mailed defendants Jim Baugh and Brian Gilbert false documents that featured David and me as eBay's two top persons of interest at the request of her supervisors. Stephanie Popp planned and endorsed the directives of her superiors and carried them out.

Unlike the other two females defendants in this case Defendant Popp had an extended relationship with

Jim Baugh, she knew what he was all about and willingly helped recruit and groom new female recruits within eBay's Global Intelligence Center. Jim Baugh had Defendant Popp help him manipulate young females analysts. She was the mom to Defendant Baugh's dad in eBay's security department according to Co-defendant Veronica Zea. Defendant Popp betrayed these young women who were her subordinates and led them down a path that made their actions acceptable to them, and when caught she coached them to obstruct the investigation. Some of them are now burdened with cyberstalking and obstruction of justice conspiracy convictions for the rest of their lives.

The defendants employed psychological warfare, they primed us for fear and it worked. We lost weight. We couldn't sleep. We were terrified of the strangers the defendants sent to our front door. David and I were prisoners in our own home.

David was always an open, caring person, he took care of my parents when they grew old and he made us all laugh. (Cries.) Now David is distressful, angry, and depressed, we are not the same people. We're worried about our future and our financial security, and there's a sadness in our lives and a sense of safety that we used to take for granted is gone.

Thank you your Honor.

THE COURT: Thank you.

THE COURT: Mr. Steiner, and as we discussed earlier, I'll hear you seated.

MR. STEINER: My name is David Steiner, I am Victim Number 2.

In my statements earlier this morning for Defendant Stockwell, I noted that it was one of the most difficult victim impact statements I've had to write. Not so with Stephanie Popp. Defendant Popp's actions were egregious, premeditated, malicious, and cruel. She was squarely at the center of this conspiracy to harass, intimidate, and threaten not only a journalist, but more importantly the most precious person in my life, my wife, Ina.

Ina has read the litany of the defendant's crimes, but our nightmare didn't begin and end in August 2019. On June 15th, 2020 when the criminal complaint was unsealed, we learned the full extent of their crimes, their attempted break-in, an invitation they published in classified ads for sex parties, and the false and dangerous dossier they showed to the police painting us as persons of interest who pose a threat to eBay executives. We learned these horrifying details along with the rest of the world.

Every time a new filing appeared in the docket it seemed to contain a new disturbing detail about what happened and what the defendants eventually had planned for us and we were the last to know. We've been waiting 3 years, 2 months, and counting, while our lives have been placed on hold while this case has been prosecuted. The amount of energy we've put into trying to understand why they did this to us has left us virtually no time for anything else in our lives.

Yet as she was awaiting sentencing, the defendant twice asked and received permission to attend a wedding in Brazil. It appears she has lived more of a life than we have over the past three years. Victims only get their say at the end, we get our say after the attorneys have argued sentencing guidelines, criminal history categories, offense level calculations, all the terms that really have no meaning to victims. Victims are told they can move the needle a bit when determining sentencing.

It's simple for me. Stephanie Popp has drastically changed the trajectory of two people's lives, stolen the sense of safety that we feel in our home, our privacy, our financial security, and our joy. Is a year and a day enough to make up for the more than three years we've lost because of her actions.

I'd like to thank the Court for listening.

THE COURT: Thank you. Now we'll proceed. We'll hear from the government, we'll hear from the defense, and I'll hear from Ms. Popp if she wishes to be heard from. The sentencing memoranda that the Court has reviewed had been filed under seal and I respect that.

Mr. Kosto.

MR. KOSTO: Thank you, your Honor. May we be heard briefly at sidebar? I understand the Court's allowed our motion. There are a couple points I need to make under the auspices of that motion that may be helpful.

THE COURT: You may.

****excised sealed sidebar ***

(In open court.)

MR. KOSTO: Thank you, your Honor. May I proceed?

THE COURT: You may.

MR. KOSTO: The government requests that the Court sentence Ms. Popp to a year and a day in the custody of the bureau of prisons and that it require her to pay the $200 special assessment. It's not seeking the imposition of a fine based on the financial information that the probation office has provided which show that she does not presently have the ability to pay a fine of any meaningful amount.

The reasons for this request, your Honor, and I start where I started this morning, the nature and circumstances of the offense under 18 USC Section 3553(a), it's only been a couple of hours, I think we were all in the courtroom, but this is still a horrifying offense at the time to the Steiners, it's the place to start and finish in this case. You've heard just minutes ago about the physical fear, the weight loss, the description of being prisoners in their own homes, and --

THE COURT: Well is it the place to start and finish? I wrestle with the larger implications of this case. I have the obligation to sentence a particular individual, a particular human being, and I accept that responsibility and that gives some borders to the consideration, but, um -- and I think I am permitted to say this based upon the written record that's before this Court. This so-called "security department" is an abhorrent, disgusting operation from the get-go, and what they were engaged in here was the suppression of speech, speech on matters of public importance.

Now it's not for this Court to cast dispersions at the corporation, but I don't think it's out of line for me to say that when you read this whole record, this smacks of Henry II, "Is there no one who will rid me of

this troublesome priest?" And then these lower-level people, the people who have been indicted, they go about this conduct that's utterly intolerable in our society.

And so I will tell you, I come on the bench -- this isn't just something between these people and the Steiners. I grant you the crime here is the conspiracy to engage in cyberstalking, so the focus is on the stalking, but the larger implications here is corporate agents trying to suppress by fear and terror speech on important public matters. That's -- that's incredibly reprehensible. And I start with that basis.

I'm not downplaying a bit the impact for the Steiners as citizens and human beings, I'm simply saying it has implications for us all if corporate agents are running around, um -- some of this stuff is ludicrous, some of it's horrifying. That's why I speak, because it isn't just what happened to them.

Go ahead.

MR. KOSTO: Not to -- I don't mean to make light of what the Court said at all, that was Point Number 3.

THE COURT: All right.

MR. KOSTO: But what I will say -- and I answered this question that Judge Saris posed in the sentencing of Mr. Harville and Mr. Baugh when she asked in substance, "What of other individuals who may have been

involved, what of the corporation whose agents accomplished some" -- "whose agents accomplished what happened here." And what I said to Judge Saris applies here today, which is that my office has said the investigation is ongoing and public and if the evidence establishes that individuals for an entity shared the intent and other elements required for a crime, then our obligation would be to see those prosecutions through. But that's not something that the government can speak to in this proceeding, nor should it.

THE COURT: Nor would I ask it. It is the executive's responsibility who to charge and with what. But we don't operate in a vacuum here. However misguided, however inappropriate, these actions were taken, it's undisputed on behalf of the company, a corporate entity. That's appalling. It's appalling in our society that there were not sufficient internal controls to prevent the absolutely, um, repulsive nature of what was going on in that department. That's not to assess legal liability, I express no opinion thereon. But you know, um, I try to live in the real world.

Go ahead.

MR. KOSTO: And we, um, ask the Court in our memorandum for a sentence that offers general deterrence for this very reason because, as we indicate, this is a

public company that comes in for some criticism, and when public companies come in for criticism, this is not an acceptable response, not even close to an acceptable response. Corporate security departments have a function and a place, but the function and place do not include the use of harassment and intimidation to target journalists. I could not agree with the Court more. And that affects our recommendation, it affects the decision to charge this case.

It is particularly disturbing, this was a journalist who was writing things that would be of interest to the people who use eBay, this is a journalist who was writing things of interest to people who invested in eBay as shareholders. And just as a simple example, the idea that the company spent money on a replica pub that the CEO happened to particularly like in New York City is not reason to reign down what happened to the Steiners. The government simply started with what happened to the Steiners because they are the most visceral presence in this courtroom of the horror of this offense.

THE COURT: This shouldn't be taken as any adverse comment on the manner of investigation by the executive, it's not, I just cannot, nor will I, separate the fact that each one of the individuals that were drawn to this

session, and indeed the presentence report, um, the other individuals out of this investigation drawn to other judges in this court, were pulling down corporate salaries of eBay, significant money from eBay, and admittedly acting in outrageous and intolerable fashion.

Go ahead.

MR. KOSTO: Which is why this situation, and as to this defendant in particular and this group of defendants, what the situation cried out for it was a pause at some early stage of these events, a pause that said, "Geez maybe it would not be a good idea to promise to pay a visit to or follow in a car a couple that had received a bloody pig's mask in the mail." And that chance was lost.

I've read, in each of the defendants' sentencings, glowing letters, appropriate to the sentencing and appropriate to these individuals, because as Mr. Steiner said this morning, a person is not the sum of the things that they did -- the worst things they've done in their life, but when I see letters that comment on a defendant's empathy or kindness as a reason to, um, temper the Court's sentence, I wonder where the empathy and the kindness was for the Steiners at that particular moment? That's not to say the person is not an empathetic and caring and thoughtful person, but it

contributes to the need for a general deterrent sentence and to a sentence of imprisonment here.

The mean sentences that the Court described from the sentencing commission, um, are helpful in the absence of a motion such as the one that the government --

THE COURT: I mean it's one thing to look at a national average, for instance in drug crimes or immigration offenses, of which there are thousands. I'm struck by the few prosecutions in the database. I simply always look because it gives me some sense of how sentences are actually being imposed.

MR. KOSTO: From that database we pulled down approximately 359 cases that used Section 2(a)(6.2), the guideline provision that covers not just stalking but also domestic violence and interstate threats to give a bit more of a wholesome picture because these cases tend to have similar facts such as the use of interstate communications and facilities, and we came out either locally, regionally, or nationally in that 30 to 40 month range as well in the absence of a motion of the sort the government brought. What I'd like to address though is what changed here from this morning because just a few hours ago we were asking the Court to impose a noncustodial sentence on Ms. Stockwell and then we're

asking here that the Court impose a custodial one on Ms. Popp, and similarly how that fits in with the sentences that we asked other sessions of this Court to impose on Mr. Baugh and Mr. Harville and Mr. Cook and even to some extent Mr. Gilbert's sentencing which is to come.

And for Ms. Popp, the Steiners have it correct in the sense that she had this ability, in a way that Ms. Stockwell did not, into the complete picture of this harassment. If you think about the fact that she may not have drafted each message, but she typed and sent all of them, so she knew from the start, unlike Ms. Stockwell, about the existence of harassing messages and the fact that they would escalate to include the publication of the victim's home address. She was in that car in Natick following Mr. Steiner. She knew the pieces of the obstruction which included the obstruction of the Natick Police Department, which is out trying to do its job, and the obstruction of the eBay internal investigation trying to uncover the who and what of the company. Unlike Ms. Stockwell she's included in the meetings, some of the meetings at which this was planned and included in the confidential and encrypted communications that Mr. Baugh was sending planning out the various pieces of the -- the various pieces of the

campaign. Almost unique among the co-conspirators, she knew almost as much as Mr. Baugh.

Each of the other defendants that I've referred to can point to parts of this that they weren't involved in. Mr. Gilbert says, "I didn't know about the messaging" -- excuse me, "the deliveries." Mr. Harville says, "I didn't know about the deliveries, I didn't know about the messaging, I was involved in the surveillance." But Ms. Popp's involvement unfortunately runs the gamut from beginning to end.

And the other point that the government submits that distinguishes her a bit from Ms. Stockwell and Ms. Zea in a negative way unfortunately is that while it was somewhat limited in relation to the outsized role that Mr. Baugh had in this campaign, Ms. Popp did have a degree of autonomy. The Steiners alluded to the fact that when there was an investigation interview and Ms. Stockwell and Ms. Zea needed to be interviewed, it was Ms. Popp that Mr. Baugh sent to sit in on it and to provide visual cues or the use of the speakers while without disclosing that she was there to help answer the questions and continue the obstruction. When things went south at the bitter end of the conspiracy, it was Ms. Popp who, apparently of her own volition, put up some messages designed to make it look like the

harassers were still out there and still a threat to the Steiners. So there is this sense that, um, absent our motion, this is a person with significant culpability and the guideline sentencing range that the Court described which applies to her is higher for that reason.

But we still have this issue of relative culpability, we still have sentences of Mr. Cook and Mr. Harville that have been imposed at 18 and 24 months, and Mr. Gilbert, to whom the government's made a commitment not to sentence greater than 37 months in its plea agreement. On the knowledge of the operation piece of this, she is at the higher end, as the government said. That's a good picture of everything that's going on.

One of the things we consider though is on the sort of professional and life experience and power within this organization, she's more in the middle to the bottom of that middle group, the nonBaugh, nonStockwell, Zea defendants, she had not 20 year police careers like Captain Cook and Captain Gilbert. She had not been in corporate security at, um -- for a dozen years like Mr. Baugh or a dozen years or so like Mr. Harville. She had no military experience. She had no government experience.

Nor however was she in her first job, um, in corporate security, had a longer history with Mr. Baugh. She was higher on the org chart than Zea and Stockwell, lower on the org chart than Mr. Baugh. So she is -- one way of thinking about her in that middle group is more involved but less experienced in judgment on what the right thing to do here should have been.

And again to a degree the government assesses Ms. Popp as worthy of some recognition of the outsized role that Mr. Baugh played. Mr. Bookbinder alluded to reasons that Ms. Popp had to be, um, open to suggestions that Mr. Baugh made in the course of this campaign and conspiracy and the government credits that to a degree.

There is a slight difference again here between the other individuals in the Global Intelligence Center who looked to Ms. Popp and Mr. Baugh as kind of a, um -- a unit, looking up to Stephanie Popp for guidance and direction, if not management. This was Jim Baugh's operation, Jim Baugh decided what was sent and what wasn't sent and when it was sent and when it wasn't sent and what the components of the campaign were going to be. But their interactions with Mr. Baugh was sometimes through Ms. Popp, who had been promoted into this position within eBay that gave her some degree of additional power that those two women at the bottom of

the pyramid did not.

So understanding that significant involvement, but perhaps less experienced than the most culpable people, the only other question the government has to address is why not more than the year and a day that we've asked for? And I think, simply put, one of those things is the reasons we've detailed in our motion and at sidebar, um, which we'd ask the Court to pay significant attention to. One of those is some of what Mr. Bookbinder said about Ms. Popp and her reasons to be open to the suggestion to join this conspiracy and go all in the very first instance. And finally the reality of the sentences that have been imposed.

You have a sentence of Mr. Harville, who has less culpability in the conspiracy but more knowledge and more experience as a former military police officer sitting at 24 months and Mr. Harville has no motion. On the other hand you have Ms. Stockwell, who the Court has just imposed a sentence of home confinement and two years of probation with the benefit of a motion from the government. And so where we land is smack in the middle of that, um, range, the year and a day, trying to capture relative culpability without undervaluing the motion or without undervaluing the horror of what happened here.

Thank you.

THE COURT: Mr. Bookbinder?

MR. BOOKBINDER: Thank you, your Honor.

And I want to start actually by thanking the government and Mr. Kosto for, um, for the recommendation. I'm not joining in that recommendation, I will explain shortly why I'm asking for a sentence that does not include incarceration but includes probation and home confinement, but I recognize that the recommendation from Mr. Kosto is well below the guideline range and does reflect the combination of unusual circumstances that Ms. Popp presents here.

And I want to focus on her in my remarks but I want to make one more comment about what Mr. Kosto said which is that I would suggest, your Honor, that the, um, things we discussed at sidebar, um, both that Mr. Kosto raised there and that I did, um, distinguish Ms. Popp from all of the other defendants in this case, including Ms. Stockwell who undoubtedly, um, credit Mr. Kosto, was less involved in the activity here, the criminal conduct than Ms. Popp. But again those factors that we discussed, um, are to Ms. Popp's credit and to an extent greater than any other defendant, including Ms. Stockwell, and it's why in part I believe that a non-custodial sentence is appropriate here.

THE COURT: Well many of those things happened after this all went to pieces. Isn't it crystal clear that she both knew and appreciated the wrongful nature of what she was engaged in from its inception?

MR. BOOKBINDER: Um, your Honor, I think --

THE COURT: I mean one can say, um, she might have felt beholden to Baugh, I can appreciate that.

MR. BOOKBINDER: Right.

THE COURT: And I said I would take that into account --

MR. BOOKBINDER: Your Honor --

THE COURT: -- but it's hard to imagine she didn't know what she was doing?

MR. BOOKBINDER: The short answer to your question is "Yes, she did," um -- we are not saying that any -- that anything I'm going to talk about today or anything you've heard excuses her conduct, is a legal defense to it, and she didn't have the capacity or understanding, we're not saying that. She, um, you know she committed these crimes, um, and, um, you know she regrets that, and she has done everything that she has been able to since to try to make up for it. But we're not saying she didn't know what she was doing.

But again I want to focus, I guess, on talking about her a little bit, there are several things I think

are important for the Court to understand. One is -- and I want to talk about the person she was before and the person she has been since that time, about how aberrant that conduct was in the rest of her life, but I also want to start out by trying to explain maybe what is underlying your question, your Honor, which is, you know, how someone who is -- and I know you've read the materials, so you've read the letters in support and read what we've put in the memo, how someone who is, by all accounts, is and who has always been a good person, could have decided to participate in this outrageous and cruel conspiracy? So I want to talk about that. And I want to focus a little bit on the circumstances that led up to this conduct. But again I want to be clear, I'm not suggesting that any of this is an excuse, um, it is just there to provide context and to explain how she could have made that decision.

So the first circumstance and factor is something again you've already raised with your questions of the government and that is the -- this atmosphere of a paranoia and obsession with criticism and with the Steiners in particular and their speech, um, from the leadership at eBay, that was, um, what was motivating all of this, the CEO and their chief marketing officer set the tone and they set the direction that led to

these crimes even if they didn't specifically direct anyone to commit them. That's the first sort of contextual factor.

Second, is again something Mr. Kosto referred to, which is the fact that this scheme was led entirely by a group of men who had law enforcement or government experience, um, that, um, Stephanie Popp did not have. They were older, they were more experienced than she was, she respected them all and she followed their lead. She shouldn't have, but she did.

Finally, and I think most important, is what the government has called throughout this investigation, um, "the Baugh factor," and certainly Mr. Kosto discussed it, although not by that name, in his remarks a little bit earlier.

Stephanie had a different relationship with Jim Baugh than Stephanie Stockwell. He was always, um, good to Stephanie Popp, he was a mentor and a supporter of her at a time when there literally weren't other people doing that for women in the security industry, he hired her at eBay and he was a personal friend.

As I described at the sidebar, he was supportive of her during a very difficult period in her life and -- and he was to the detriment of his own career, and she was indebted to him because of that, she didn't want to

let him down. Again this is not meant to excuse her criminal conduct. But it is important to understand how she could commit these crimes even though she has been and is a truly good person. And let me just talk about that for a minute.

I know, your Honor, you've read what we've submitted, I'm not going to go through what those letters say or what we said in our sentencing memo, but there are a couple of themes that I want to mention here because I think they're important.

Stephanie is someone who has always been focused on her family. She, as a child, her family moved frequently because of her parents's jobs and she was the one who supported and protected her younger sister each time they moved to a different school, and transitions were very difficult. When they were a little bit older and their parents were out of the country and the three siblings were living in the U.S., even though Stephanie wasn't the oldest, she was the middle one, she was the one who paid everybody's bills, who paid the mortgage, who kept everyone going to their doctors appointments, she was the one her parents relied on.

And she's always been giving a lot of her time to others, from the time she was in college through right now, volunteering and working in hospitals and with

children, she helped friends through the most difficult periods in their lives, you've read about that, they talked about it in their letters. But there's no question that during the time she was at eBay she lost her way and that's why she's here now.

Since that time she has refocused on her family, on her community, on her faith. She has cared for older sick relatives, again that's in the letters that you've read. She's done hundreds of hours of community service work. She has rededicated herself to her church.

She also has changed the circumstances of her life completely since 2019. She has no interest of ever returning to the security industry. She has left California. She's lived first for a year or so with her brother in Philadelphia, um, and now near her parents and extended family in the southeast. While she was in Philadelphia she worked full-time with children with disabilities helping provide, um, counseling and teaching to them. She now works in the health and wellness industry helping people live healthier lives. And she volunteers weekly at a homeless shelter. So that is the person Stephanie has been and is now.

And with that in mind, I want to explain why I believe that a sentence here of 2 years of probation with a year in home confinement is sufficient but no

more than necessary for the purposes of sentencing in this case.

First of all, specific deterrence. The government agrees that that is not a factor here, there is no need to deter Stephanie, she has been her own toughest critic for the past three years, she will never appear again in this courtroom or any other. But there's no question, um, as you mention, your Honor, that general deterrence is important in every case and it's certainly important in this case.

I suggest that the prosecution, this prosecution has already sent that message loud and clear. The initial charges in this case generated tremendous nationwide, actually international publicity, as did the guilty pleas of all seven defendants in this case. The significant prison sentences imposed on Jim Baugh, but also Harville and Cook, have sent that deterrent message as well. And the Steiners have filed a civil suit against all of the defendants but also including the company, eBay, the CEO, and the chief marketing officer, and adding those individuals in the company to the list of those involved. All of that has sent a tremendous --

THE COURT: What difference does that make that they filed a civil suit? I don't think that, one -- certainly I express no opinion on that, that would be

improper, I'm very clear on that. I have a criminal indictment to which Ms. Popp has pleaded guilty. I must, in accordance with the 3553(a) factors, fashion a fair and a just sentence.

Yes, this happened in a larger context. But the fact that there's some civil suit, I must say, isn't going to add or subtract anything, I wouldn't think. Why would it?

MR. BOOKBINDER: So the only reason, your Honor, is, um, I think it is relevant to the question of general deterrence in the sense that, as you've raised yourself, there is a question about what about the company, what about sending a message more broadly? One of the things that helps accomplish that, I imagine, and I haven't spoken to the Steiners or the lawyer about it, but I imagine that's one of the motivations behind that suit, is I think it does send that message as to the company and as to a broader group of individuals involved in the company --

THE COURT: We'll see what a jury of the people has to say and then that would be an adjudication.

MR. BOOKBINDER: Correct, your Honor.

THE COURT: I -- let me say it very clear, I express no opinion on that whatsoever.

Go ahead.

MR. BOOKBINDER: Thank you, your Honor.

So my point here on the topic of general deterrence is that there has been tremendous focus on this case, um, a tremendous focus on the consequences for the defendants --

THE COURT: Properly so.

MR. BOOKBINDER: I agree. I agree.

But my point is that whether Ms. Popp receives a sentence of imprisonment or not, I would suggest does not move the needle on that general deterrence meter. That's the point.

I do not intend to address the question of whether the Court should impose a fine since the government hasn't asked for one. If the Court's considering it, I'd be happy to do that. But as you know the presentence report concludes that --

THE COURT: I've read the material.

MR. BOOKBINDER: -- the defendant would not be in a position to pay a fine.

With that said, there's no question that Stephanie has pled guilty, she has committed these crimes, she knows she will be punished, that's appropriate here, and I would suggest that a sentence of 2 years in probation with a year to be served under the restrictive terms of home confinement is appropriate and sufficient. I'd ask

you to impose that sentence and let her continue rebuilding her life and serving her community.

THE COURT: Thank you.

Ms. Popp, you have the right to talk to me directly. You're not required to. If you want to, I'll hear you now.

THE DEFENDANT: Thank you, your Honor.

Good afternoon, your Honor. First and foremost I would like to do something that I've been wanting to do for a very long time.

(Turns towards victims.)

THE DEFENDANT: Ina and David, from the bottom of my heart I am so sorry for what I did to you, for all the pain that I caused, and for being a horrible human being to you. My actions were evil, hurtful, callous, and words can't express how ashamed I am and disappointed for putting the two of you through this. Not a day goes by that I don't think about you and how much pain I put you through. I know that this is a big "if," but I hope you can find it in your heart to forgive me.

(Turns back.)

THE DEFENDANT: Your Honor, the truth is I was in denial regarding the severity of my wrongdoing during and immediately after our criminal operation. I didn't

think to rely on my faith, values, moral compass, and intuition to realize that what I was doing was just downright immoral and disgusting.

I chose to look past all the red flags and continue down a wrongful path. One of the worst things was that I have always prided myself for being courageous and a good role model, but I failed miserably when I chose not to speak up and do the right thing. I have not only caused such hurt to the Steiners, but I also failed the individuals who were either looking up to me or following my example.

Your Honor, I wish I could turn back time, I really do, but I know that's impossible, and the only thing possible is to repent and change my course of action. I can't tell you how many nights I have gone to sleep crying, asking the Lord for forgiveness, and beating myself up for straying so far from the rightful path. My priority in life has shifted drastically. My faith, family, and friends are at the forefront of everything in my life. All I want to do is spend both my working time and free time helping others as I really am determined to become the best version of myself.

I now make a conscious decision every day to live with purpose and meaning. I find myself constantly thanking our heavenly father for every small thing that

I have, including the difficulties thrown my way. Every day I wake up and I am grateful that I get yet another day and another chance to improve myself in making decisions.

I do still have hope that I will be able to settle down and start my own family soon. I have anxiously waited until this day to be able to apologize to Ina and David. And I hope that whatever decision you make today, your Honor, they will be able to put this horrible chapter behind them.

I would also like to take a moment to apologize to my family. I am so sorry for the shame, embarrassment, and pain that I have caused every single one of you. Mom and Dad, you raised me to be so much better than this and I'm so sorry for disregarding all your teachings, values, and morals. Thank you for standing by me through this chapter of my life and for continuing to show me love and compassion.

Last but certainly not least, I'd like to thank you, your Honor, for allowing me to travel out of the country earlier this year to see my little sister get married. It meant the world to me to be able to stand by her on her special day. And for that I am and always will be eternally grateful to you.

Thank you.

(Pause.)

THE COURT: Ms. Stephanie Popp, pursuant to 18 United States Code, Section 3553(a), and in light of the information provided by the United States Attorney, your attorney, the probation office, and yourself, this Court sentences you to a year and a day in the custody of the United States Attorney General, to be followed thereafter by 2 years of supervised release with all the general conditions of supervised release and the special conditions set forth on Pages 36, 37, and 38 of the presentence report. They'll be no fine due to your inability to pay a fine. You are required to pay the $200 special assessment required by the law. Let me explain this sentence to you.

I -- as I try to do in every case, fashion a specific sentence for the specific person, and that's what I've tried to do here, and the sentence is my responsibility.

There has to be a sentence of prison for you and the reason is simple, you were at the very center of this unfathomable conspiracy.

Now the government made a motion for which it takes responsibility and which I allowed and which I have credited, as I've credited the things that Mr. Bookbinder so ably has said. Were it not for those

factors, you'd be going to prison for a lot longer. A lot longer. But in your case this is a fair and a just sentence.

At the same time, while you have every right to apologize to the Steiners and say what you said to your folks, this is not between you and the Steiners, the implications of this case are so much broader than you or even the other co-defendants. This is one of the most important cases upon which this Court has ever sat.

This out-of-control group of which you were a central part is, if not stopped now and stopped completely, an extraordinary danger to our country. Make no doubt about it, the skills that you employed to go cyberstalking are an extreme danger, and when you put those skills to service of some large corporate entity with economic power to go after individuals and squash down their speech, we are all at risk. All of us. That's what you did.

I believe -- I do, I believe your aspirations were good, I recognize the good things that you've done. You haven't earned the right to use the word "courageous" with respect to any of this, except perhaps what happened after it all fell to pieces. There's nothing courageous about any of this.

I want to read something, because it doesn't apply

to you specifically, but it does inform this Court's, um -- it informs this Court's beliefs about why yours', and your co defendants', is such an important case, and it's simply a speech given by a representative in Congress and it has the timely title "The Perpetuation of our Political Institutions." And as politicians are sometimes known to do, it starts with a bit of bombast about the national defense, and now I'll quote it to you.

It says a foreign army "could not by force, take a drink from the Ohio, or make a track on the Blue Ridge, in a trial of a thousand years. At what point then is the approach of danger to be expected? I answer," the representative says, "if it ever reach us, it must spring up amongst us. It cannot come abroad. If destruction be our lot, we must ourselves be its author and finisher. As a nation of freemen, we must live through all time, or die by suicide.

I hope I am over wary," he says, "but if I am not, there is, even now, something of ill-omen amongst us. I mean the increasing disregard for law which pervades the country, the growing disposition to substitute the wild and furious passions, in lieu of the sober judgment of Courts, and the worse than savage mobs, for the executive ministers of justice."

That speech was given over 100 years ago -- 175 years ago, we learned a little more about that representative in the years following, his name was Abraham Lincoln.

You were part of that danger. You are an example of that danger. And while the spectrum is broad -- and I do not compare you to the insurrectionists of January 6th, but I tell you without equivocation, your conduct is on that same spectrum. The sentence the Court has imposed is a fair and a just sentence.

You have the right to appeal from any findings or rulings the Court has made against you. Should you appeal and should your appeal be successful in whole or in part and the case remanded, you'll being resentenced before another judge. Mr. Bookbinder, if an appeal is decided upon, you want transcript, seek it from this session of the court.

Do you understand?

MR. BOOKBINDER: I do, your Honor.

THE COURT: The government has no objection to self-reporting in this case?

Oh, the probation officer has a point.

PROBATION OFFICER: Yes, your Honor.

The first conversations with the Western District of Kentucky has indicated that they do not need the

Condition 4.

THE COURT: And therefore Condition 4, which I imposed, is vacated and I thank you for that comment. That's vacated.

No objection to self-reporting?

MR. KOSTO: No.

Would the Court please order the conditions of release continued until the time of reporting?

THE COURT: I do so order.

She will report to the place of confinement on Tuesday the 22nd of November, 2022.

MR. BOOKBINDER: Your Honor?

THE COURT: Yes.

MR. BOOKBINDER: On that issue I believe that's the Tuesday before Thanksgiving.

THE COURT: It is.

MR. BOOKBINDER: Could she report the following week?

THE COURT: She can.

MR. BOOKBINDER: Thank you.

THE COURT: We'll stand in recess.

(Ends, 4:15 p.m.)

C E R T I F I C A T E

I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do hereby certify that the forgoing transcript of the record is a true and accurate transcription of my stenographic notes, before Judge William G. Young, on Tuesday, October 11, 2022, to the best of my skill and ability.

/s/ Richard H. Romanow 10-19-22
________________________
RICHARD H. ROMANOW  Date